CIVIL ACTION NO. **4:17-cv-03447**

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LINDA LOZANO,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )    CIVIL ACTION NO.:
                                 )      4:17-CV-03447
LYONDELL CHEMICAL COMPANY,       )
                                 )
        Defendant.               )

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

LINDA LOZANO

OCTOBER 16, 2018

*****************************************

        ORAL AND VIDEOTAPED DEPOSITION of LINDA LOZANO,
produced as a witness at the instance of the DEFENDANT,
and duly sworn, was taken in the above-styled and
numbered cause on OCTOBER 16, 2018, from 9:36 a.m. to
3:56 p.m., before Stephanie M. Harper, RPR, CSR in and
for the State of Texas, recorded by machine shorthand,
at the offices of KENNARD RICHARD, P.C., 2603 Augusta
Drive, Suite 1450, Houston, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto; that the
deposition shall be read and signed before any notary
public.

JOB NO. 278823

1      Q.   Okay.  So what were the actual job

2  responsibilities?

3      A.   I cannot answer that because I don't have

4  a copy with me.

5      Q.   Okay.  And we'll probably -- we probably

6  have something here, and we'll get to that --

7      A.   Okay.

8      Q.   -- before too long.

9           And so how long were you a department

10  assistant in the Global Projects group?

11      A.   October 23, 2012, through September 4th,

12  2015.

13      Q.   Were you ever an Admin Assistant III?

14      A.   That's what I was labeled at.

15      Q.   Okay.  So your --

16      A.   That's what -- that's what the department

17  assistants are labeled at.

18      Q.   Okay.  So the -- your testimony is that

19  the department assistant position is the same

20  position as an Administrative Assistant III?

21           MS. KRZESIENSKI:  Objection.

22      A.   No.

23      Q.   (BY MR. HAYS)  Well, I'm just -- I'm

24  sorry.  I'm just trying to understand.  So you said

25  that the Department Assistant III is -- department

1    programs as office resource secretary during the

2    25-year --

3         A.    Yeah.

4         Q.    -- period?

5              Let's -- I'm still trying to figure out

6    how to get -- so the performance evaluations that --

7    that have been produced in this matter showed that

8    you were an Administrative Assistant III, that that

9    was your title.  So I'm trying to figure out where

10   the -- where the switch was made between department

11   assistant and Administrative Assistant III.

12              So you said you joined in 2012 as a

13   department assistant Global Projects group and at --

14   and when did you start working for Roger Schuering?

15        A.    October 2012.

16        Q.    So in October of 2012 is when you first

17   started working for Roger Schuering?

18        A.    Yes.

19        Q.    And at that time your position was a

20   department assistant?

21        A.    Yes.

22        Q.    Were there other department assistants in

23   the Global Projects group?

24        A.    At a different level.

25        Q.    Who would that --

1      A.   Senior.  Senior assistants.

2      Q.   Okay.  Who would that have been?

3      A.   You want names?

4      Q.   Yes.

5      A.   Beverly McKenney and Estela Ponce.

6      Q.   Okay.  So -- and Estela Ponce was -- what

7  was her title; do you know?

8      A.   Senior assistant.

9      Q.   Okay.  So a senior administrative

10  assistant?

11      A.   Um-hmm.

12      Q.   All right.  And what was Beverly

13  McKinney's title?

14      A.   Same.

15      Q.   A senior administrative assistant?

16      A.   (Nodded head.)

17      Q.   And your title was Admin Assistant III?

18      A.   Right.

19      Q.   Okay.  All right.  So during -- after you

20  joined the Global Projects group in 2012, did you

21  ever have communications with Roger Schuering where

22  he communicated to you about your, you know, work

23  product?

24      A.   Yes.

25      Q.   All right.  And what types of

1    communications did you have with him about that?

2        A.    In the office, his office, with HR

3    present.

4        Q.    And we might be getting into something

5    later on, so when was that, if you remember?

6        A.    Time frame?

7        Q.    Yes.

8        A.    Beginning January of 2013.

9        Q.    So you started in October of 2012, and in

10   January of 2013, that was the first time you

11   remember having a meeting with Mr. Schuering and you

12   said HR?

13       A.    No.  We had a meeting October, the first

14   day I showed up to work with him.

15       Q.    Okay.  And what did y'all discuss in that

16   meeting; do you remember?  It was a long time ago

17   so --

18       A.    Job description.

19       Q.    Okay.  And what did they explain to you

20   would be your -- what was your job description then?

21       A.    It was office work, along with supporting

22   the other two assistants, which at the time was not

23   Beverly, but Di, and housekeeping.

24       Q.    So let's break that down.  What do you

25   mean by office work?  Can you be more specific than

1    office work?

2         A.    Contractor files, the time, the time

3    limitations on their work, construction report,

4    order supplies.  And if I had the sheet with me, I

5    could read it off.

6         Q.    So what do you mean by construction work?

7         A.    Construction work is when you take

8    information from the construction workers, the

9    coordinators, and the time limitations that are

10   going to be on the certain project in order to know

11   how many hours you're going to have to include in

12   the budget.

13        Q.    Okay.  And when you say construction

14   workers, those are construction workers that work

15   for Lyondell Chemical Company?

16        A.    Exactly.  They come in to do a turnaround,

17   so they're there like the time of the project and

18   then they're gone, you know.  You've got S&Bs.

19   You've got all kinds of -- Fluor Daniel.  You've got

20   several, you know, out there.

21        Q.    Okay.  So they're like contract

22   construction workers from other companies?

23        A.    Well, there's firms in the city of Houston

24   that handle construction work, and by construction

25   work is like a turnaround in a petrochemical plant,

1    they come in and build the unit.

2        Q.   Okay.  And so what was -- your role was

3    managing the -- the, you know, paperwork that went

4    along with those assignments?

5        A.   Exactly.

6        Q.   Okay.  And what kind of -- what kind of

7    paperwork was it that you were managing?

8        A.   The hours, the time, the safety

9    necessities.  Whatever went -- the meal orders.

10       Q.   So that when you say the hours and time,

11   you are -- you are keeping track of the construction

12   workers' timecards spent on the job?

13       A.   Yes.

14       Q.   Okay.  And when you said "ordering," you

15   said ordering...

16       A.   Lunches.

17       Q.   Lunches.

18       A.   Meals.  Meals.

19       Q.   Okay.  And you're ordering lunches for

20   them on a daily basis?

21       A.   Not necessarily.

22       Q.   Okay.  So what was the -- what was the --

23   when did you order lunches for them?

24       A.   When they met a safety milestone, say, 30

25   days, 30 days, 60 days, 120 days, no accidents.

1      Q.   So the Lyondell Chemical Company would

2   coordinate a lunch for them to have a lunch for

3   the --

4      A.   Lyondell Petrochemical pays for the lunch.

5      Q.   Okay.  And you would be the one that

6   helped coordinate all that?

7      A.   Yes.

8      Q.   So you would order the -- decide what to

9   order, you know, put everything together and

10   coordinate the lunch and make sure that it was

11   delivered on time?

12      A.   The manager in charge of the project would

13   select what he wanted and sign on a piece of paper,

14   so I was responsible for doing the work, not

15   deciding on what to -- what they were going to eat.

16      Q.   Okay.  I understand.  I think you also

17   said that one of your jobs as -- starting in 2012

18   was to order office supplies, is that correct?

19      A.   Correct, yes.

20      Q.   All right.  And how did you go about, you

21   know, replenishing office supplies?

22      A.   You go online with whatever vendor the

23   company is entrusted in.

24      Q.   And was it just for Global Projects?  I

25   mean, who are you replenishing office supplies for?

1          A.    Global Projects and any employee that has

2     come from another area like Mumbai employees or the

3     Netherland employees that have come to work for the

4     Global Projects department.

5          Q.    Were there different like areas that

6     required you to -- you were required to check on, or

7     was it like one specific --

8          A.    No.  Two areas.

9          Q.    Okay.  What were the two areas that you

10    were required to maintain?

11         A.    Assign -- that I was to travel inside the

12    plant to the Whitehouse, which was another office of

13    Global Projects and it's called the Whitehouse, and

14    check for supplies there.

15         Q.    Okay.  So you would check and replenish

16    supplies at the Whitehouse, which is another part of

17    the plant?

18         A.    Exactly, yes.

19         Q.    But separate from the Global Projects

20    building, right?

21         A.    No, it's -- it's separate from the --

22    there were two areas of Global Projects:  one on

23    Sheldon Road and one inside the plant that you had

24    to go through security.

25         Q.    Okay.  And the Whitehouse is inside the

1    plant where you had to go through security?

2         A.   Yes.

3         Q.   And then your -- you know, your office

4    where you typically worked out of was at the Global

5    Projects building?

6         A.   Yes.

7         Q.   Okay.  And what other roles and

8    responsibilities did you discuss in October 2012?

9         A.   I questioned housekeeping, and very

10   quickly I'll tell you it had on there clean the

11   refrigerator, clean the lobby, clean the coffee bar,

12   when we have a cleaning crew that I work very

13   closely with.  And I explained that I worked very

14   closely with the cleaning crew.  Because a lot of

15   times you have food -- a table that they brought

16   food in and they don't clean it and they get blamed

17   for that.  But then again if they remove the food,

18   they get blamed that they stole the food.

19              So I worked very closely with the

20   cleaning people, and I questioned that to

21   Mr. Schuering about housekeeping when we had Aztec

22   cleaning services.

23        Q.   And what was his response; do you

24   remember?

25        A.   You need to take care of this, and that's

1   it.

2       Q.    And by saying you need to take care of

3   this, it meant you need to coordinate getting the

4   cleaning done?

5       A.    No, he didn't specify.  He just said

6   you're in charge of housekeeping.

7       Q.    But he never said, Ms. Lozano, I need you

8   to go take this trash and throw it away?

9       A.    Oh, yes.

10      Q.    Do you recall when that happened?

11      A.    Well, yes.

12      Q.    Can you tell me?

13      A.    I can't give you an exact date.

14      Q.    Was it in 2012?

15      A.    2013 too.  No, 2012 it was too new.  2013.

16      Q.    So what exactly did you say to

17  Mr. Schuering about the housekeeping?  You said we

18  have a contractor, Aztec cleaning services, that

19  performs these services?

20      A.    Yes.

21      Q.    And so during your time at the Global

22  Projects group, did you coordinate cleaning services

23  with Aztec?

24      A.    Yes, I worked with them.

25      Q.    Right.

1          A.   Because they always came to me because

2     they needed a guidance way of doing things, you

3     know, because one is telling you one thing and

4     another one is telling you another thing.

5     Meanwhile, the ants are climbing up the table.

6          Q.   Who do you mean one is telling you one

7     thing, another one is telling you -- can you be a

8     bit more specific.  I'm sorry.

9          A.   The Aztec people came to me because I

10    would direct them into you need to complete this and

11    go ahead and do it.  I'll talk to that admin

12    assistant.

13         Q.   And so let's just -- in 2012 did you

14    coordinate services with Aztec cleaning services?

15         A.   When I needed to.

16         Q.   Okay.  And how often was that?

17         A.   When it was needed.

18         Q.   Okay.  So would you say you did it on a

19    daily basis, you would --

20         A.   No.

21         Q.   -- coordinate with Aztec?

22         A.   No.

23         Q.   Was Aztec on a contract with Lyondell?

24         A.   Yes.

25         Q.   And how long was that contract typically;

1    do you know?

2         A.    No, I don't.

3         Q.    Was it month to month?

4         A.    No, no.  They do a yearly contract as far

5    as I remember.

6         Q.    Okay.

7         A.    But it depends which group they're

8    bringing in and how the contract is based and, you

9    know, the cost elevation, the budget, et cetera.

10        Q.    And so anytime, you know, cleaning

11   services were required, you said like ants crawling

12   up the wall, right, if somebody in the Global

13   Projects group said, hey, there's ants crawling up

14   the wall in X office, then you would receive a

15   notification about that?

16        A.    Yes.

17        Q.    And who would you receive that from, just

18   whoever --

19        A.    The admin assistants.

20        Q.    Okay.  So from, I think you said Di at the

21   time or Beverly McKenney?

22        A.    Um-hmm.

23        Q.    And they would send you a message and say,

24   hey, there's ants in this office?

25        A.    Yes.

1        Q.    And then what would you do next?

2        A.    Contact facility services.

3        Q.    Okay.  And then what was the -- kind of

4    walk me through the rest of the process to how Aztec

5    would eventually show up or how the situation was

6    resolved.

7        A.    The person would come in -- since I had

8    contact with them, the person would come in, and

9    we'd talk to the area that needed cleaning up, and

10   that's the way it was taken care of.

11       Q.    And Aztec -- so aside from maybe like ants

12   on the wall or spiders in the ceiling or whatever,

13   right, they also had, you know, daily assignments

14   that they carried out in the office; is that

15   correct?

16       A.    Yes.

17       Q.    And so they would -- what were their

18   assignments; what was their responsibility?

19       A.    Aztec assignments?

20       Q.    Yes.

21       A.    Well, the vacuuming and the cleaning.

22       Q.    So --

23       A.    But that was their department.  That was

24   not my department.  I just handled it when they came

25   to me and they had a question about what do we do in

1          A.    Correct, yes.

2          Q.    And so your testimony is that somebody

3    explained to you that you needed to go buy those

4    supplies and bring them back to the office?

5          A.    Um-hmm.  Yes.

6          Q.    And who was it that told you that?

7          A.    Estela Ponce.

8          Q.    Okay.

9          A.    But she was contract at the time, so she

10   -- you know, she didn't mind traveling everywhere.

11         Q.    Okay.  Was she your supervisor?

12         A.    No.

13         Q.    Did you report to Ms. Ponce?

14         A.    No.

15         Q.    Was it typical that Ms. Ponce would direct

16   your work?

17         A.    Well, she handed out a lot of material for

18   me to do, as print this manual.  Not my supervisor.

19   She didn't get hired until August of 2014.

20         Q.    And so Estela Ponce told you, hey, you've

21   got to go out and buy all this stuff for supply?

22         A.    Drinks.

23         Q.    Drinks and bring it back to the office?

24         A.    Um-hmm.

25         Q.    And you said no, we have a vendor to do

1    2013?

2         A.    The answer is yes, at the service center.

3         Q.    Okay.  So this is the same -- same role as

4    you had in 2013?

5         A.    Correct.

6         Q.    Okay.  And then the next bullet point is

7    coordinate facilities service needs for the Global

8    Projects service center?

9         A.    Correct.

10        Q.    Okay.  Were you doing that in 2013 as

11   well?

12        A.    Yes.

13        Q.    And you would -- last one is schedule

14   reserve meeting rooms as required for the group.

15              Do you know who the -- who's the group

16   referred to in this list?

17        A.    The group is -- is referred to the Global

18   Projects group and any contractor on-site.

19        Q.    Okay.  So that's like the Fluor

20   Enterprises or whoever --

21        A.    No, no, no.  Any contractor on-site doing

22   design work in the office.

23        Q.    Okay.  So you had -- you had contract

24   workers inside the Global Projects service center

25   that were working on different projects at various

 1    times?

 2         A.    Exactly, yes.

 3         Q.    Okay.  And so you had to schedule and

 4    reserve meeting rooms for them?

 5         A.    Yes.

 6         Q.    Okay.  And was that something you were

 7    also doing in 2013?

 8         A.    Yes.

 9         Q.    Okay.  And I guess we started in the

10    middle of the list so we skipped a couple but the

11    first two bullet points, the top one is order

12    supplies for Global Projects, including the services

13    building and the Global Projects building and the

14    Whitehouse, right?

15         A.    Correct.

16         Q.    And is that something that you were doing

17    in 2013 also?

18         A.    No.

19         Q.    Okay.  So what -- what was the -- I mean,

20    we say order supplies here a few times.  What's the

21    -- here you say, no, I wasn't doing this in 2013.

22    So what was new about this -- this bullet point that

23    you were required to do?

24         A.    The inclusion of the Whitehouse at another

25    location, that's what's new in this paper right

 1  represent to you that that's what the -- that's what

 2  the -- the document says.

 3           And then that later, you know, the

 4  company gave you an additional week to complete that

 5  assignment.  They said, okay, well, you know, if you

 6  can have it done -- try to have it done by the 14th

 7  of April, okay, and that's also in the information

 8  that we've produced in this matter.

 9       However, you -- I mean, you did complete it,

10  and you completed it before the extended deadline,

11  but would you -- is it fair to say that the company

12  worked with you to try to help you give you time to

13  complete the projects on --

14       A.   No.

15       Q.   -- your action plan?

16       A.   No.

17       Q.   Well, it kind of sounds like they were, to

18  me, based on the emails.

19           So how were they not helpful?

20           MS. KRZESIENSKI:  Objection; form.

21       A.   I don't recall.  So it's a no.  The

22  company did not.

23       Q.   (BY MR. HAYS)  So the company didn't

24  extend your deadlines during your action plan in

25  order to accommodate your ability to, you know,

 1    complete the assignments?

 2                    MS. KRZESIENSKI:  Objection.

 3         A.    I don't recall that.

 4         Q.    (BY MR. HAYS)  But you also can't recall a

 5    specific instance where the company was -- you know,

 6    wasn't helpful; is that right?

 7                    MS. KRZESIENSKI:  Objection.

 8         A.    No.

 9         Q.    (BY MR. HAYS)  So I believe your next

10    progress meeting was scheduled for April 21st.  Do

11    you know one way or another?

12         A.    No.

13         Q.    Okay.  Let me see if I can find it.  Let's

14    move off of -- move off the progress meetings for a

15    second.

16                    Would you say that you had difficulty

17    completing any of the assignments on your

18    performance improvement action plan on Exhibit 4?

19         A.    Yes.

20         Q.    Can you identify which ones you had

21    difficulty completing?

22         A.    No.

23         Q.    No.  You just recall generally that some

24    of it was -- was difficult for you to do?

25         A.    Yes.

1          Q.   Is there a particular reason why one of

2    these assignments was more difficult than another?

3                    MS. KRZESIENSKI:  Objection; form.

4          A.   I don't recall.

5          Q.   (BY MR. HAYS)  At some point during your

6    performance improvement plan, you took a vacation.

7                    Do you remember that?

8          A.   Yes.

9          Q.   Okay.  I think it was in May of 2015

10   perhaps, or was it in June?

11         A.   Of what year?

12         Q.   Of 2015?

13         A.   No.

14         Q.   Well, the performance improvement plan

15   was -- was scheduled to go from March 10th until

16   June 12th of 2015, correct?

17         A.   Correct.

18         Q.   And at some point in that -- in that span

19   of time, you took a week-long vacation from work,

20   and there was a -- you had a back-and-forth with

21   Mr. Schuering about it, you were gone for about a

22   week.  He asked you to, you know, put in a vacation

23   request, and you did so?

24         A.   Yes.

25         Q.   Yeah.  And then as a result of that

1   vacation, the company extended the deadline for your

2   performance improvement plan again because they

3   wanted to make sure that after you returned from

4   your vacation you had enough time to finish all the

5   assignments, correct?

6                    MS. KRZESIENSKI:  Objection.

7            A.   I don't recall that.

8            Q.   (BY MR. HAYS)  Well, I'll represent to you

9    that when you -- when you requested the vacation,

10   the company gave you an additional seven days and

11   extended your performance improvement plan deadline

12   to June 19th, 2015.  Do you recall having any

13   progress meetings after you returned from vacation

14   but before you started your FMLA -- FMLA leave?

15           A.   No.

16           Q.   Did you -- do you recall what date your

17   FMLA leave started?

18           A.   June the 18th.

19           Q.   Okay.  And then so the day before the

20   extended PIP, performance improvement plan, was set

21   to expire, correct?

22           A.   I don't know.

23           Q.   Okay.  So the company, like I said, the

24   company extended your deadline for the performance

25   improvement plan to June 19th, and you started your

1        Q.    You did question what?

2        A.    PIP.

3        Q.    You questioned your performance

4   improvement plan?

5        A.    My performance improvement plan.

6        Q.    But you can't recall what exactly you

7   questioned?

8        A.    No.  I don't have notes with me.

9        Q.    Was it a question about what you were

10  supposed to do on the performance improvement plan?

11       A.    No.  I don't recall.

12       Q.    Do you recall whether it was, you know,

13  some type of, you know, complaint that the, you

14  know, performance improvement plan was unfair to you

15  in some way?

16       A.    No.

17       Q.    But you asked questions about the

18  performance improvement plan at some point during

19  that meeting?

20            MS. KRZESIENSKI:  Objection; asked and

21  answered.

22       A.    I don't recall.

23       Q.    (BY MR. HAYS) Okay.  All right.  So that

24  was the -- that was the first scheduled update

25  meeting for your performance improvement plan, was

1    April 7th.

2              The next one was scheduled for 14 days

3    later on April 21st.  Do you recall attending the

4    April 21st performance improvement plan meeting?

5         A.   Yes.

6         Q.   Yes.  And do you recall the substances of

7    that meeting?

8         A.   No.

9         Q.   No?  The -- did you -- do you have any

10   recollection about the projects that you discussed

11   or what steps in the performance improvement plan

12   you had completed at that point?

13        A.   No, I do not recall.

14        Q.   And during that meeting did you make any

15   kind of complaints about, you know, the -- that the

16   PIP was somehow unfair to you?

17        A.   I don't recall.

18        Q.   I think the next meeting was on May 8th,

19   2015.  So the next PIP meeting was on May 8th, 2015,

20   and same questions, do you recall attending the May

21   8th, 2015 meeting?

22        A.   Yes, I remember attending the meeting.

23        Q.   Okay.  And do you recall the -- you know,

24   the substances of that meeting, what you discussed

25   during that meeting?

1          A.    No, I don't.

2          Q.    No.  And during that meeting on May 8th,

3    2015, do you remember or did you make any comments

4    to Mr. Schuering or Ms. Silvagnoli about the

5    substance of your performance improvement plan?

6          A.    I don't recall.

7          Q.    Do you recall whether or not you

8    complained that it was unfair to you?

9          A.    I don't recall that.

10         Q.    Okay.  I think the next regularly

11   scheduled meeting was extended to accommodate for

12   your vacation, and so there was supposed to be a

13   June 2nd meeting that never occurred because that

14   was during your vacation that we talked about

15   earlier.

16               And that also is where the deadlines for

17   your performance improvement plan were extended to

18   June 19th.

19               And then I think we established earlier

20   too that you left on approved FMLA leave around June

21   16th and then the next progress meeting didn't occur

22   until August 22nd, 2015.  Do you recall -- I think

23   you testified previously that you recalled having a

24   meeting with Ms. Silvagnoli on August 26th about the

25   progress of your performance improvement plan; is

1   while standing near your desk said, hey, I did an

2   investigation?

3               MS. KRZESIENSKI:  Objection.

4       A.    That's all I recall.

5       Q.    (BY MR. HAYS)  Did you ask any questions

6   to Ms. Silvagnoli when she stopped by your desk and

7   said we did an investigation into your claims of age

8   and race discrimination?

9       A.    Yes.

10      Q.    And what did you ask her?

11      A.    Who are the lawyers you talked to.

12      Q.    And what was her response?

13      A.    Downtown.  And that was it.

14      Q.    You didn't ask her any other questions?

15      A.    No, sir.

16      Q.    You didn't -- I mean, it -- so far you've

17  testified that you don't recall ever claiming that

18  you were being discriminated against based on your

19  race and your age; is that correct?

20      A.    Correct.

21      Q.    And then Angela Silvagnoli stops by your

22  desk and says that she's done an investigation into

23  your claims of age and race discrimination and you

24  didn't -- I mean, that would -- you didn't ask any

25  questions about why she did the investigation?

1   there would be an investigation into why these

2   individuals are pinpointing you if you didn't make

3   any allegations against them?

4          MS. KRZESIENSKI:  Objection; form.

5      A.   No.

6      Q.   (BY MR. HAYS)  And if these other

7   individuals were potentially, I think,

8   discriminating against you or pinpointing you, how

9   come it is that only Mr. Schuering is named in your

10  complaint?

11     A.   He's the boss for me.

12     Q.   So.  So Mr. Schuering is Pat McFall's

13  boss?

14     A.   No.  Mr. Tripp is the overall boss.

15     Q.   But --

16     A.   Mr. Schuering was my boss.

17     Q.   So is it your testimony that Mr. Albosta

18  and Mr. McFall never discriminated against you?

19     A.   Correct.

20     Q.   So the only person that you're -- that

21  you're identifying that's discriminated against you

22  is Mr. Schuering; is that correct?

23     A.   Yes.

24     Q.   Okay.  Did anybody else ever witness the

25  discrimination that you've described so far here

1    today during your testimony?

2         A.   Not that I recall.

3         Q.   In your answers or interrogatories, we

4    asked you specifically whether or not there are

5    potential witnesses to support your contention that

6    Mr. Schuering treated you differently and less

7    favorable than those employees that were younger

8    than you and not Hispanic, and you answered with a

9    number of individuals, including William Gallagher.

10                    Does William Gallagher ring a bell to

11   you?

12        A.   Yes.

13        Q.   And who is William Gallagher?

14        A.   William -- project manager for the HBIB

15   project of 2013.

16        Q.   Okay.

17        A.   Who I worked directly with too.

18        Q.   Okay.  And so he potentially witnessed you

19   being treated differently than younger, non-Hispanic

20   employees?

21        A.   Yes.

22        Q.   And when did that potentially occur?

23        A.   I don't recall.

24        Q.   What about Kwan Molten?  Does that name

25   ring a bell?

1          A.    Kwan Molten?

2          Q.    Um-hmm.

3          A.    Yes.

4          Q.    And who is Mr. Molten?

5          A.    He's no longer at the company.

6          Q.    Okay.  But who was he while you were

7     employed at --

8          A.    He worked as a project manager.

9          Q.    And you allege that he -- or you contend

10    that he also potentially witnessed Mr. Schuering

11    treating you differently --

12         A.    Yes.

13         Q.     -- and less favorably than younger,

14    non-Hispanic employees?

15         A.    Yes.

16         Q.    And same thing for Steven Rhea; is that

17    right?

18         A.    Steven Rhea.

19         Q.    Steven Rhea?

20         A.    Steven Rhea.

21         Q.    Who's Steven Rhea?

22         A.    Steven Rhea is the technical quality

23    assurance manager, still at the company.

24         Q.    And how do you know he's still at the

25    company?

1      A.    He -- you know that LinkedIn?

2      Q.    Um-hmm.  Love it.  I'm on it all the time.

3      A.    Okay.  Okay.  Everybody's on LinkedIn, you

4    know, like, and so he's still there.

5      Q.    Okay.  All right.  And you contend that he

6    witnessed Mr. Schuering treating you differently

7    than younger, non-Hispanic employees?

8      A.    Yes.

9      Q.    Do you recall when that happened?

10      A.    No, sir.

11      Q.    And what is the basis for your contention

12    that these three individuals potentially saw you or

13    witnessed Mr. Schuering treating you differently

14    than younger, non-Hispanic employees?

15      A.    We worked on all the projects together.

16      Q.    And so since you worked closely together,

17    certainly they must have seen it?

18           MS. KRZESIENSKI:  Objection.

19      A.    Yes.

20      Q.    (BY MR. HAYS)  Did you ever talk to either

21    of these individuals about Mr. Schuering treating

22    you differently than --

23      A.    No.

24      Q.    -- other employees?

25      A.    No.

1        A.    I have no answer to that.

2        Q.    Did Roger Schuering also retaliate against

3   you for taking FMLA leave?

4        A.    Yes.

5        Q.    Is it not true that your contention is

6   that you were retaliated against because you weren't

7   provided sufficient enough time to meet your PIP

8   requirements?

9        A.    Correct.

10       Q.    Okay.  Because that's what you answered in

11   our interrogatories?

12       A.    Yes.

13       Q.    All right.  But -- okay.

14           Who do you allege was treated differently

15   than you, let's say, based on your age first?

16       A.    For better or worse?  What's your --

17   direct the question, like, what do you mean?

18       Q.    Okay.  Sure.  So you contend that other

19   employees were treated better than you because they

20   were younger and non-Hispanic, correct?

21       A.    Correct.

22       Q.    Okay.  So the question is:  Name an

23   employee that was treated better than you because

24   they were younger?

25       A.    That person's no longer there.

1        Q.    Okay.  But who was it?

2        A.    I don't recall her name.

3        Q.    And what was her position?

4        A.    Contract employee.

5        Q.    And what type of contract employee?

6        A.    Office administration.

7        Q.    And office administration for what group?

8        A.    For constructions.

9        Q.    So --

10       A.    Turnarounds.

11       Q.    But she wasn't employed by Lyondell

12   Chemical Company?

13       A.    No.

14       Q.    No.  And she wasn't doing the same job as

15   you were?

16       A.    In some areas, yes.

17       Q.    Okay.  How were her jobs similar to yours?

18       A.    Office, office work.

19       Q.    What do you mean by office work?

20       A.    Typing, letter, supplies, setting up

21   meetings, setting up lunches.

22       Q.    Did y'all work for the same individuals,

23   or did you have different supervisors?

24       A.    Different supervisors.

25       Q.    So did you create material and work

1    product for the same supervisors at some point or

2    the same managers?

3         A.    No.

4         Q.    No.  Did she report to the same manager as

5    you did for any of her assignments?

6         A.    No.

7         Q.    But she was -- you contend she was similar

8    to you because she did a lot of the same type of

9    work.  She did office work with reports and using

10   Excel to create, you know, trackers or making

11   PowerPoint presentations; is that right?

12                   MS. KRZESIENSKI:  Objection.

13        A.    I do not recall what she did, but I know

14   what I did.

15        Q.    (BY MR. HAYS)  Okay.  But so -- but you

16   recall -- you don't remember her name but you --

17        A.    No.

18        Q.    All you recall is she was younger than

19   you?

20        A.    Yes.

21        Q.    And this was in what year?

22        A.    2015.

23        Q.    What month in 2015?

24        A.    I don't recall.

25        Q.    And you don't recall a specific instance

 1    in 2015 where that individual was treated better

 2    than you?

 3         A.    No, sir.

 4         Q.    Do you know what her age was?

 5         A.    Early 30s maybe.

 6         Q.    What's the basis for that?  Just a guess?

 7                MS. KRZESIENSKI:  Objection.

 8         A.    I don't -- I cannot answer that.

 9         Q.    (BY MR. HAYS)  Okay.  And what about

10    individuals that were treated better than you based

11    on their race?  That's another one of your

12    allegations, correct, that people were treated

13    better than you that weren't -- that were

14    non-Hispanic; is that correct?

15         A.    Correct.

16         Q.    And who was the individual that was

17    treated better than you because they were

18    non-Hispanic?

19         A.    I don't recall her name.

20         Q.    And was it the same individual who we were

21    previously discussing about age?

22         A.    No.

23         Q.    Okay.  So a different individual than who

24    we previously just discussed about age

25    discrimination?

1          A.    Yes.

2          Q.    Okay.  And what was the position of the

3    person you contend was treated better than you

4    because they were not Hispanic?

5          A.    Admin assistant.

6          Q.    And was she an employee or a contractor?

7          A.    Contractor.

8          Q.    And how -- what year was it?

9          A.    I don't recall the year.

10         Q.    Do you recall a specific instance where

11   she was -- it was -- it was a woman, you said?

12         A.    Yes, sir.

13         Q.    And do you recall an instance where she

14   was treated differently than you because of her

15   race?

16         A.    No, I don't recall.

17         Q.    Do you recall since she was a contractor,

18   did y'all have similar job duties?

19         A.    Yes, sir.

20         Q.    And what were the similarities in your job

21   duties?

22         A.    Same office work.

23         Q.    So compiling reports?

24         A.    Exactly.

25         Q.    Creating presentations?

1          A.    Um-hmm.

2          Q.    Submitting trackers to your supervisors,

3    that sound --

4          A.    General --

5          Q.    -- appropriate?

6          A.    General office work.

7          Q.    Okay.  But you had additional duties that

8    she probably didn't have, right?

9                MS. KRZESIENSKI:  Objection.

10         A.    Yes.

11         Q.    (BY MR. HAYS)  And you reported to a

12   different supervisor, correct?

13         A.    Correct.

14         Q.    And y'all didn't work together.  You and

15   this individual didn't work together on projects

16   that were submitted to the same, you know, manager

17   or director or group; is that correct?

18         A.    No, that's not correct.

19         Q.    Okay.  So what's not correct about that

20   statement?

21         A.    At one time or another, you had to work

22   together.

23         Q.    Okay.  Work together on what?

24         A.    A project.

25         Q.    What type of projects?

1        A.    Turnaround projects.

2        Q.    Okay.  So you, like, worked together on

3    the same spreadsheet?

4        A.    No.

5        Q.    Work together on the same schedule?

6        A.    No.

7        Q.    So how do you -- how do you quantify that

8    you were working together?  What do you mean by

9    working together?

10        A.    The report coming in from the turnaround

11    sent to me and I documented it.

12        Q.    Okay.  So you received information from

13    that individual on the projects that they were

14    working on?

15        A.    Updates, yes.

16        Q.    And then what did you do with those

17    updates?

18        A.    Transfer them to the report.

19        Q.    Okay.

20        A.    And submit it.

21        Q.    But you did testify that y'all had

22    different supervisors.  You didn't report to the

23    same people, right?

24        A.    Yes.

25        Q.    Okay.  Is there anyone else that you

1       A.   No.

2       Q.   Okay.  Do you contend that Estela Ponce

3    was treated differently than you?

4       A.   Yes.

5       Q.   How so?

6       A.   As a contract employee, the privileges,

7    cell phone, vehicle, et cetera.

8       Q.   So you're saying that when Ms. Ponce was a

9    contract employee, she was treated more favorably

10   than you because some of the rules that applied to

11   you did not apply to her?

12      A.   Correct.

13      Q.   Anything else?

14      A.   No, sir.

15      Q.   But after a certain period of time, I

16   think probably in 2013, Ms. Ponce was hired by the

17   company, correct?

18      A.   No.  August 2014.

19      Q.   August 2014?

20      A.   Yes.

21      Q.   She takes a -- she was hired as a senior

22   administrative assistant; is that correct?

23      A.   Yes.

24      Q.   Okay.  Any time after August of 2014 after

25   she was no longer a contractor that you feel like

1    she was treated more favorably than you?

2         A.   Yes.

3         Q.   And can you give me an example?

4         A.   The assignments that came with it.  I was

5    given every assignment that she didn't want to do.

6         Q.   So your testimony is that she was treated

7    more favorably because she was able to pass off

8    assignments that she did not want to do to you?

9         A.   Correct.

10        Q.   Was she directing the reassignment, or was

11   somebody else redirecting the reassignment?

12        A.   I don't understand what you're trying

13   to --

14        Q.   So was Ms. Ponce, was she just saying,

15   hey, I need some help with these assignments; I

16   can't cover down on all of this at once; can you

17   help me with X, X, and X?

18             Was she sending you an email directly?

19        A.   No.

20        Q.   And how did you receive assignments that

21   --

22        A.   Walked it into the office and put it on my

23   desk.

24        Q.   Who is that?

25        A.   Estela.

1      Q.   So she would just take an assignment and

2    bring it in to you and say, hey, I need you to do

3    this?

4      A.   Here's a 3-inch manual.  We need ten

5    copies.

6      Q.   Okay.  Is that the only basis for your

7    contention that she was treated better than you?

8      A.   No.

9      Q.   So what else is the basis for your

10   allegation that she was treated better than you?

11     A.   I'm not going to elaborate on any because

12   I don't recall specifically unless I would have my

13   notes.

14     Q.   Are those the notes that you've been

15   keeping while we've been talking today?

16     A.   I'm writing down things that you have been

17   talking about.

18     Q.   Are there notes in there that would help

19   you recall what I'm asking you right now?

20     A.   I -- if I wrote them down, yes.

21     Q.   So there's potentially something in there

22   about how Ms. Ponce was treated better than you that

23   you've written down in that notebook --

24     A.   No.

25     Q.   -- that's sitting right there next to you?

1        Q.   (BY MR. HAYS)  So like a diary almost?

2        A.   No.

3        Q.   So when you were at work, would you take

4   time and sit down and write down what was happening

5   to you at work?

6        A.   No.

7        Q.   So how -- when did you create the notes?

8        A.   In a staff meeting.

9        Q.   So while you were in a staff meeting, you

10   created notes about Ms. Ponce being treated

11   differently --

12        A.   No.

13        Q.   -- than you?

14        A.   No.

15        Q.   Okay.  So when did you create the notes

16   that we're talking about that potentially relate to

17   your allegations?

18        A.   You jot down things, you know, as you go

19   and that's it.  But then again, I don't know where

20   they are.

21        Q.   Okay.  So aside from what may be in your

22   notes, you can't recall anything else here today or

23   any other circumstance sitting here today where

24   Ms. Ponce was treated more favorably than you?

25        A.   No, sir.

1        Q.    Other than what you've already testified

2   about?

3        A.    No.

4        Q.    Okay.  Did you and Ms. Ponce report to the

5   same people?

6        A.    No.

7        Q.    Did y'all have the same assignments or job

8   duties?

9        A.    No.

10        Q.    And she was -- we've already established

11   she was a -- she was an administrative assistant,

12   but she was one step up, I think, a senior

13   administrative assistant; is that correct?

14        A.    As of 2014, yes.

15        Q.    After she was hired, right?

16        A.    Correct, yes.

17        Q.    Okay.  Can I see what you've been writing

18   down on those notes today?

19        A.    Sure.  (Tenders documents.)  Here you go,

20   starting there.

21        Q.    All right.

22             MR. HAYS:  Do you want to just go off

23   the record real quick --

24             MS. KRZESIENSKI:  Um-hmm.

25             MR. HAYS:  -- while I take a look and

1    you need to be put on the PIP.

2        Q.    Okay.  So in 2014 you had a meeting with

3    Mr. Schuering, and he said if you don't improve your

4    performance, we're going to have to put you on a

5    performance improvement plan?

6        A.    This was December 2014.

7        Q.    Okay.  And then I think it says -- what's

8    this underlined word underneath 2014?  What does

9    that say?

10       A.    The scenario, I'm just kind of setting up

11   the scenario, how the statement came to be.

12       Q.    Okay.  And so in this scenario, I think

13   underneath that it says "statement?"

14       A.    Yes.

15       Q.    And are you -- you have something in

16   quotes here, at least you have the beginning of it

17   in quotes.  Who are you saying -- who are you

18   quoting as making this statement?

19       A.    Mr. Roger Schuering at the top.

20       Q.    And can you -- so these notes say that --

21   or I guess contain your allegation that

22   Mr. Schuering stated to you during a meeting in

23   December of 2012, quote, Diana tells me you are

24   unskilled.  And then there's something crossed out

25   and it says, "know about office work," period.

1          A.    This was 2014.

2          Q.    Okay.

3          A.    Two years.  You're unskilled, and you

4    don't know about office work.  That's the -- that's

5    what's on there.

6          Q.    Okay.  And so then I guess underneath

7    "work," it says, "my question is."  Are you saying

8    this is your question?

9          A.    Yes.

10         Q.    Okay.  And what is your question?

11         A.    Diane retired two years ago.  Why would

12    she be involved in comments about my work?

13         Q.    Okay.  And what did Mr. Schuering say to

14    that?

15         A.    His answer, we met outside the company to

16    -- or it meant like they met outside the company.

17    And in the conversation she told me you need much.

18    I don't remember what the much was, but that's all I

19    remember.

20         Q.    So all of -- all of this that's written on

21    Page 4 starting at "Mr. Schuering in 2014 with PIP,"

22    everything down from that point carrying over to

23    Page 5 at the top, you created these notes last

24    night.  And it is what you allege to be

25    Mr. Schuering discriminating against you based on

1    your age and your race; is that correct?

2         A.    Correct.  But I already had these

3    meeting -- these notes, I just copied them to the

4    new notebook.

5         Q.    So these are copied from another set of

6    notes you have?

7         A.    Right.  The ones I shredded last night.

8         Q.    So you shredded all your notes last night?

9         A.    Whatever I had copy -- was copying on

10   here, yes, I shredded them.

11        Q.    Are there other notes that you didn't

12   shred?

13        A.    I don't know.  I'll have to look.

14        Q.    Well, why -- why -- why would you copy the

15   notes into a different notebook -- or notebook,

16   yeah, and then shred them?

17        A.    Because the other notebook was so flimsy

18   and all the pages were already torn up.  I had them

19   in the garage in a box, and they were all wrinkled,

20   and it was -- it wasn't a good copy.

21        Q.    So how did you get an accurate copy on

22   here if it wasn't a good copy?

23        A.    I looked at what I wrote down and wrote it

24   over here.

25        Q.    So if you could do that there, then why

1    wouldn't you just bring that here and look at the

2    original copy?

3         A.   I don't know.  I couldn't answer that.

4         Q.   What else did you shred last night?

5         A.   Old mail.  Old business cards I had.

6         Q.   Is it your normal practice to shred

7    things?

8         A.   Yes.

9         Q.   How often do you conduct these shredding?

10        A.   Every couple of months.

11        Q.   Is it often that you shred your notes from

12   -- that you took while you were with your employer

13   from 2014?

14        A.   Those that I don't want to see, yes.

15        Q.   Did you copy everything in the notebook

16   that you shredded?

17        A.   It wasn't a notebook.  It was just sheets

18   of paper like this.

19        Q.   I thought you said it was a big, flimsy

20   notebook that had been --

21        A.   No.  Well, the flimsy notebook at the --

22   the binder was already all cut up, you know, but it

23   didn't have much in there.  It had like a lot of

24   folders, you know, the yellow, green, blue folders,

25   and that's it.

1        Q.    So whatever the contents that was in

2   there, you shredded all of it though, correct?

3        A.    Correct.

4        Q.    And did you copy everything that was

5   contained in that notebook into this notebook that

6   we're looking at right now?

7        A.    Only what's pertaining information that I

8   wanted to remember but --

9        Q.    Well, what was -- what else was in that

10  notebook?

11       A.    Vacation schedules of people that I had no

12  reason to keep, emergency exits, emergency logs that

13  you keep of employees to know where they're going to

14  go in case of an emergency.  A hurricane, say, in

15  June, you always write down the employees and have a

16  contact number.  I don't need all that information.

17             Anniversaries of the employees.  I don't

18  need that.

19       Q.    Okay.  And, I mean, I guess I would

20  generally agree with you you don't need it.  But I'm

21  wondering what prompted you last night to start

22  shredding it?

23       A.    I had to kill time because you're coming

24  to a deposition and your mind is rolling, rolling,

25  you know.

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   LINDA LOZANO,                )
                                  )
 4        Plaintiff,              )
                                  )
 5   v.                           )    CIVIL ACTION NO.:
                                  )       4:17-CV-03447
 6   LYONDELL CHEMICAL COMPANY,   )
                                  )
 7        Defendant.              )

 8
     ****************************************************
 9   THE STATE OF TEXAS :

10   COUNTY  OF  HARRIS :

11

12        I, Stephanie M. Harper, a Certified Shorthand

13   Reporter in and for the State of Texas, hereby

14   certify to the following:

15        That the witness, LINDA LOZANO, was duly sworn

16   by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given

18   by the witness;

19        That the deposition transcript was submitted

20   on _____, 2018, to the witness, or to the

21   attorney for the witness, for examination,

22   signature, and return to U.S. Legal Support, Inc.,

23   by _____, 2018;

24        That the amount of time used by each party at

25   the deposition is as follows:
```

1          MS. LAURA KRZESIENSKI - 00:00
           MS. MARLENE C. WILLIAMS - 00:00
2          MR. JOHN T. HAYS - 03:52
           MS. MAYRA O. CUELLO - 00:00

3

4

5       I further certify that I am neither counsel

6 for, related to, nor employed by any of the parties

7 or attorneys in the action in which this proceeding

8 was taken, and further that I am not financially or

9 otherwise interested in the outcome of the action.

10       GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

11 this, the 23rd day of October, 2018.

12

13

14

15     _____

16     STEPHANIE M. HARPER, CSR
       Certification No.:  7433
       Expiration Date:  12-31-18

17

18

19 U.S. Legal Support, Inc.
   Firm Registration No. 122
20 16825 Northchase Drive
   Suite 800
21 Houston, Texas 77060
   713/653-7100
22

23

24

25 JOB NO. 278823 [LOZANO]